# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**STEVEN LEE MOSS,**

      Petitioner    ,                    Case. No:
                                             Honorable

v.

**THOMAS WINN, Warden,**

      Respondent.

_____/

LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES
By: David L. Moffitt (P30716)
Attorney for Petitioner Steven Lee Moss

# PETITIONER
# STEVEN LEE MOSS
# PETITION FOR WRIT OF HABEAS CORPUS

LAW OFFICES OF DAVID L. MOFFITT & ASSOCIATES
THE BINGHAM CENTER
30800 TELEGRAPH ROAD SUITE 1705
BINGHAM FARMS, MICHIGAN 48025
[web] DAVIDLMOFFITT.COM
[e] DLMOFFITTASSOC@AMERITECH.NET
[f] 248.307.9545
[v] 248 644.0880

NOW COMES, Petitioner, STEVEN LEE MOSS ("Petitioner"), by and through his attorneys, LAW OFFICES OF DAVID L. MOFFITT L. ASSOCIATES, by David L. Moffitt (P30716), and for his Petition for Writ of Habeas Corpus, sets forth the following:

1.      Petitioner is a citizen of the United States and lives in the State of Michigan;

2.      Petitioner is unconstitutionally imprisoned by the Respondent, Warden Thomas Winn, at the Saginaw Correctional Facility, in Freeland, Michigan, Saginaw County;

3.      On November 22, 2013, after a bench trial, Petitioner was found guilty of possession with intent to distribute over 1000 grams of cocaine, MCL 333.74012A1 and felon in possession of a firearm, MCL 750.227BA;

4.      On January 6, 2014, Petitioner was sentenced to a term of 15 to 45 years, plus 2 years, consecutively, for the felony firearm;

5.      Venue is proper in this Court because Petitioner was convicted in Oakland County, which is in the Eastern District, Southern Division of Michigan;

6.      Petitioner has exhausted all state remedies with regard to the constitutional arguments raised in this petition;

7.      Petitioner is being detained unconstitutionally because he was constructively deprived of his Sixth Amendment right to counsel based on his attorney's complete failure to investigate the case and interview witnesses.  The unconstitutional detention is also a result of Petitioner being deprived of his Sixth Amendment right to be represented by counsel of his choice where he was frequently represented by an attorney he did not retain. The illegal detention is also predicated on the fact that Petitioner was deprived of his right to be represented by an attorney who would advocate his cause and require that the State prove every element of the charges offenses beyond a reasonable doubt.

1

## STANDARD OF REVIEW

28 USC §2254(d) imposes the following standard of review in a habeas case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1)    Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Id.* §2254(d).

A decision is "contrary to" clearly established law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v Taylor,* 529 US 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

8.    Petitioner has not filed a previous Petition for Writ of Habeas Corpus in this or any other federal district court;

9.    This petition is timely brought within the one-year statute of limitations for habeas corpus actions under 28 USC §2244(d)(1)(a).

## STATEMENT OF FACTS

### I.

### INTRODUCTION AND BACKGROUND

Petitioner was originally charged with one count of controlled substance delivery, heroin/cocaine, 1000 grams or more, contrary to MCL 333.7401 (2) (a) (i), and felony firearm, contrary to MCL 750.227b (a).[1] Moss waived his preliminary exam on January 16, 2013. On or about March 28, 2013, a First Amended Information was filed, adding a conspiracy charge as to Mr. Moss. On or about August 12, 2013, a Second Amended Information was filed, identifying the felony firearm charge as being only allegedly related to Mr. Moss.

The facts and circumstances giving rise to this alleged offense occurred on or after August, 2011, when Mr. Moss met someone named Michael Bennett. Bennett had been in federal prison with Mr. Moss' friend. At first, Bennett came around just to be friends. Then in April, 2012, he showed up many times, claiming to have large sums of money and wanting Mr. Moss to do things for him, including to seek out drugs for Bennett to purchase. Moss refused and denied any knowledge about drugs or suppliers.

After Moss repeatedly declined, Bennett changed tactics, and told him about coming on the drug business with him, claiming he could turn around the drugs in a couple of days and give Mr. Moss the money he needed to prevent his home from going into foreclosure. Bennett told him that the money Moss had been saving for his house and Bennett's money could be pooled together for a drug transaction and they would generate a huge profit. At first, Moss refused this offer as well. Bennett convinced him to meet at a Red Robin restaurant. When Moss arrived, Bennett was there along with a Hispanic gentleman, named "Diego."[2] Nothing of significance reportedly transpired at this first meeting.

Afterwards, Bennett continued to pressure Moss about using his house money for a drug transaction. Then, Diego called Moss and told him to meet at an Applebee's Restaurant. Moss

---

[1] A co-defendant, Lamar Jerome Kendrick was also charged with count one and count two of conspiracy to deliver heroin/cocaine, 1000 grams or more.
[2] Diego's legal name is Louis Fernando Velez-Pavas, and he was a paid government informant.

3

thought that Bennett would also be there. Bennett did not show up but told Moss to go ahead and meet with Diego without him. Again, nothing of significance transpired at this second meeting. As Moss was leaving, Diego took him to his (Diego's) vehicle, hit a button, opening a panel and showing lots of what appeared to be packages of narcotics. Diego told Moss that this is what he could give him if Moss came up with the money. Moss left the restaurant and informed Bennett what had happened. Bennett then told Moss to give Diego the money and to do the deal by himself since Bennett owed a lot of money to Diego.

After this second meeting, Diego kept calling Moss, telling him that it was now or never because he was going out of town. A meeting was set up at the Home Depot. Moss appeared but did not have enough money. Diego told him he would "front" him the narcotics, to be paid by Moss at a later date. The police arrived and arrested Moss. It is then discovered that these two individuals, Bennett and Diego, were in fact working with law enforcement.

After being charged, Moss, through his first attorney, Paul Curtis, filed a Motion to Conduct an Entrapment Hearing on or about March 13, 2013. The People filed a response on or about March 29, 2013. Thereafter, Attorney Curtis was suspended from the practice of law. Attorney Curtis told Moss that he would get Elbert L. Hatchett, another defense attorney, to handle the case.[3] Since Attorney Curtis never paid a portion of his fee to Attorney Hatchett, the trial court appointed Attorney Charles D. Toby on or about May 31, 2013. Attorney Toby was substituted by Attorney David Steingold on or about September 6, 2013, just 10 days before the start of the entrapment hearing and the jury trial.[4]

## II.

---

[3] Attorney Curtis told Mr. Moss that he would give a portion of his fee to Attorney Hatchett so that Hatchett would take over the case. Attorney Curtis never paid any portion of the fee to Hatchett and Hatchett never entered an appearance.
[4] Mr. Moss retained Attorney Steingold because he did not believe that Attorney Toby was properly representing him, since he kept urging Mr. Moss to plead guilty.

## ENTRAPMENT HEARING (9-16-2013)

### A. STEVEN MOSS

Moss testified that he is 43 years old (EH I, 8).[5] Michael Bennett brought him into this crime. He came in contact with Bennett around April, 2011 (EH I, 9). Bennett came home from prison and showed up at Moss's place and asked Moss if he could help him get into the real estate business (EH I, 12). At that time, Moss had about 8 or 9 rental properties. They initially spoke for about 30-45 minutes (EH I, 12-13). A week later, Bennett called Moss and asked him if he could meet him at a hall (that Moss owned), because he wanted to put on a bachelor party for his best friend Frank (EH I, 14). Bennett did not show up at the hall but sent Frank and another guy to meet with him about the bachelor party (EH I, 18).

Two to three days after the party, Bennett showed up and thanked Moss for the party (EH I, 19). Their relationship during the first year was just average, where they would see each other, eat out and talk (EH I, 20). Then, in April, 2012, Bennett showed up and said to Moss that he wants to find and buy some drugs. Moss told him he does not sell drugs (EH I, 22). One month later (May, 2012), Bennett told Moss he had money for 3 kilos and asked Moss if he knew where he could purchase some. Moss told him he was not into that kind of stuff. There was never any agreement/arrangement between Moss and Bennett that Moss would be looking for kilos for Bennett to purchase. (EH I, 23).

During this time, Moss testified that his real estate business was not doing well. His rental houses were empty and his home was going into foreclosure. He spoke with an attorney to do a loan modification on all of his properties (EH I, 24). He was trying to find the money to save his home by selling some things and trying to secure a loan (EH I, 25). The next time he

---

[5] The transcripts are designated as follows; entrapment hearing, EH I (9-16-2013); EH II (9-17-2013); EH III (9-19-2013); EH IV (11-1-2013); Bench Trial Vol I (11-18-2013); VOL II (11-22-2013) and Sentencing (1-6-14)

saw Bennett was in early June, 2012. They went to lunch and he told Bennett about his home and financial problems (EH I, 27). Bennett kept telling him he had a drug deal in the works and Moss could make money off of it. Moss kept telling him he wanted no part of it (EH I, 32). The next time Moss saw Bennett was later in June when Bennett came to one of his rental houses and they had lunch. Bennett kept talking about a drug deal and also told him he knew someone who could obtain vehicles (EH I, 33).[6] Bennett knew at this point in time that Moss's home had been sold at a sheriff's sale (EH I, 34).

After this meeting in late June, 2012, Bennett started coming around at least once a week. This time, Bennett told Moss that someone had just run off with money that was owed to him (EH I, 35). Each time they met in July, 2012, Bennett always talked about a drug deal. Bennett kept telling Moss to give him the money that Moss had saved (about $240,000.00) and he could make money off of it and save Moss's house. Moss kept refusing. (EH I, 36-37). The next time he saw Bennett was in August, 2012 when Bennett came to Moss's home located on Patton Street in Detroit (EH I, 38). Bennett told him that he had a deal in Florida but the guy wanted a really big deal and he told Moss that with his money (Bennett's) and Moss's, he could double the money. Moss kept declining and Bennett continued to pressure Moss to do the drug deal during the month of August (EH I, 38-39).

The next time he saw Bennett was in September, 2012 and Bennett seemed very downcast, almost in tears, because he told Moss he had lost some person's money and he was worried about what was going to happen to him. He asked Moss for money and Moss told him no. Moss was keeping his money in order to save his house. Bennett then stormed out (EH I, 41). In early October, 2012, Bennett showed up again. Bennett kept saying that he owed this guy money and he was asking Moss about his house situation. Moss was stressed out and he could

---

[6] Bennett was driving a Mercedes-Benz 500 model at this time (EH I, 33).

not sleep. Moss told him no and told Bennett that he was meeting with some hard money lenders so he could save his home (EH I, 42). Bennett next came around in mid-October, 2012 and kept talking more of the same stuff. He told Moss that some people were coming up from Florida and kept asking Moss if he wanted in on this deal and Moss kept telling him no. Moss was working with his attorney and some lenders to save his house (EH I, 44). Ultimately, Moss could not get the money from the lenders and he had no more financial moves available to save his house (EH I, 45). Bennett knew the loan had fallen through and kept pressuring Moss to give him the money for this drug deal. Moss continued to refuse (EH I, 46).[7]

A few days later, Bennett called him and told him to meet him at the Red Robin restaurant so Moss could give him the money. Bennett promised to give him an extra $90,000.00 in 2-3 days (EH I, 49). Bennett then took him to the bathroom and gave him $39,000.00 in cash and told him to put that cash with Moss's money (EH I, 50). When they went back to the table, Bennett's friend, Diego, was at the table. Bennett and Diego were doing most of the talking. Bennett said he had to go and told Moss to give Diego his number so he could speak with Moss directly (EH I, 51). Diego then called Moss on November 7, 2012 and told him to meet him at the Red Robin. Moss called Bennett and told him to come to the meeting. Bennett said he was not coming because Diego was mad at him and told Moss just to go to the meeting without him (EH I, 53). Diego showed Moss some cocaine in a secret compartment of his vehicle. After Moss left, he called Bennet and told him about what had happened (EH I, 55). Moss told Bennett to come and get his money and he could deal with Diego directly. Bennett assured Moss that it was fine and he could continue to deal with Diego directly (EH I, 56). The next day, November 8, 2012, Diego called Moss and told him to come to Applebee's. They met and Diego said he was

_____

[7] It is pretty obvious that Bennett continued to pressure Moss during the time that Moss was in financial trouble in order to induce him to commit a drug crime.

getting ready to leave and that they need to hurry up and do the deal. Moss tells Diego he can come to his house. After this meeting, Moss calls Bennett and tells him he's worried about his whole situation (EH I, 56).

Moss told Bennett he did not want to do this deal. Bennett says that Moss may get hurt if he does not go through with the transaction. Then, Bennett tells Moss that he would take care of it and Moss should not change his mind because he would leave his child homeless and in the street (EH I, 58).[8] Diego called the next day and asked to set up the deal. Moss is still nervous and scared and tells Diego he would call him back (EH I, 59). They agree to meet at the Home Depot. Moss brings with him a plumber so he could purchase some plumbing supplies (EH I, 60). Moss arrived and drove around the parking lot and did not see Bennett's car and started to leave when the plumber asked if he could go into the store to purchase his plumbing supplies (EH I, 61). As he was getting ready to leave, Diego called him and told him he was coming outside to his car. Diego came over and asked about the money. They walked over to a van and Diego kept trying to explain to him about how to work the switches to a secret compartment and Moss was not interested because he thought all he had to do was drop off the money and Bennett would take the vehicle with the drugs inside (EH I, 62). Moss was given the van keys and Diego and his associate took off running. Immediately after they took off running, the police came from everywhere (EH I, 64).

On cross-examination, Moss stated that the first time he spoke to Bennett was while Bennett was incarcerated in federal prison with Moss's cousin (EH I, 76).[9] He may have spoken to Bennett from prison about 10 times over a 3-year period and their conversations were mainly about real estate (EH I, 77). When Bennett was released from prison, he called Moss (EH I, 79).

---

[8] Moss has a young daughter.
[9] Apparently, Bennett was in federal prison on a drug case (EH I, 88).

From about June, 2011-February, 2012, Moss had sporadic contact with Bennett. In March, 2012, Bennett started coming around more often (EH I, 80). In April, 2012 Bennett approached him about having money and looking to purchase some drugs. Moss told him he did not deal in drugs (EH I, 85).

Moss testified that he had worked for the railroad and stopped working in 2005 when he injured himself in a car accident (EH I, 90). He started buying rental properties in 2007 (EH I, 91). Moss purchased his home for about $450,000.00 and put down $80,000.00. His monthly payment was $2900.00 (EH I, 92). Moss spoke to a couple of realtors about selling his rentals but they would not list them because he owed so much on them for taxes (EH I, 94).[10] The Mercedes vehicle he purchased in 2007 for about $10,500.00 for his mother and paid for it by a check from his bank account. His mother offered to sell the vehicle but there were problems in doing so.(EH I, 101). Prior to this deal, he never bought or sold cocaine.

Moss stated that he knew Jay Smith through other mutual friends for about 5-6 years (EH I, 102). Smith came to Moss's place on the morning of November 9, 2012 to vent about his marital problems. Smith had some kind of cleaning and big landscaping business (EH I, 105). Moss denied ever supplying Smith with drugs and Moss did not know if Smith sold drugs (EH I, 106).[11] Moss stated that he was keeping the $240K in cash at his home and not at the bank (EH I, 108).

Moss admitted to meeting with Diego a couple of times without Bennett. Moss was scared by Bennett because Bennett kept telling him to go through with the deal because people may get hurt if he refused (EH I, 112). Moss admitted to inviting Diego to his house even though

---

[10] He owed about $14-15K in back taxes on the rental properties (EH I, 96).
[11] It should be noted that some cocaine was found at Moss's residence when his home was searched on November 9, 2012. Moss denied that the cocaine belonged to him or any of his family members and he denied knowledge that the cocaine was there (EH I, 106).

9

he just met him a couple days earlier because Moss did not feel comfortable at the restaurant and because he did not want Diego to hurt Bennett (EH I, 128).[12]

At this point during the hearing, Moss's attorney had Moss waive his right to a jury trial (EH I, 130).[13]

After the waiver, Moss testified that the deal was for 10 kilos of cocaine. He did admit to asking Diego on the 8th of November, 2012 for 40 kilos, but that was at Bennett's direction (EH I, 132). Moss further stated that he knew a Tony Rodriguez through a guy named Keith Lakey.[14] Tony was setting up a shrimp business in September, 2010 and Moss was asked to invest in that business (EH I, 134). Moss denied asking Tony to get him some cocaine (EH I, 137). The digital scale and cocaine cut that were seized at the Patton property did not belong to him. There was no mail there nor any of his personal items (EH I, 147). The prior tenant that was renting from Moss had left the house three months prior to the search (EH I, 150). Moss further stated that the plan was for Bennett to drive the van with the kilos, Moss was to supply the money and then Bennett would return his money to him in 2-3 days (EH I, 161).

Moss said there was no set time for Jay Smith to come over on November 9, 2012 (EH II, 5). He does not know why Smith would tell the police that he was at his house to purchase cocaine (EH II, 9). Moss also denied selling Smith 125 grams of cocaine about three weeks prior to this encounter (EH II, 10). Moss had a gun on his person because he has a CPL license (EH II, 15). Smith was arrested at Moss's house and charged for the cocaine that was found there (EH II,

---

[12] It should be remembered that Bennett told Moss that he owed Diego a lot of money and Diego wanted this deal to go through so he could recoup some of his money that was owed by Bennett.

[13] This is important because attorney Steingold's reason for encouraging the waiver was because he told Moss he could not be prepared to go to a jury trial right after the hearing (*See* Moss's Affidavit, attached to Motion to Remand). This waiver is an issue on appeal.

[14] Keith Lakey went to prison over some real estate matters (EH I, 137).

58). Finally, Moss testified that he lost his home and was evicted in June, 2013). He was living with his mother at the time of the hearing (EH II, 68).

## B. ANTHONY RODRIGUEZ

Anthony Rodriguez knew Moss. Keith Lakey owned a car lot and introduced him to Moss (EH II, 88). He met Moss around the end of 2011 after Tony came out of prison for a drug offense (EH II, 89). He met Moss because he was looking for investors for his shrimp business. Moss expressed interest in investing in the shrimp business (EH II, 90). Moss invested $10,000.00 in cash when they met and discussed the business. Tony told Moss that he did not deal drugs and he did not do drugs (EH II, 91-92). Tony used the money given to him by Moss to purchase shrimp. A few months later, Tony told Moss he needed more money to buy shrimp so Moss gave him another $20,000.00. At this meeting, Moss allegedly told Tony that they could make more money from drugs and Tony told Moss that he would locate someone who could supply drugs (EH II, 93). Tony said he had no intention of getting drugs for Moss, even though he told him he would find someone. Tony used Moss's investment to buy more shrimp. When the cocaine was not supplied, Moss allegedly started threatening Tony and his family and accused him of working with the federal government (EH II, 94).

Tony said that in order to placate Moss, he gave Moss a gram of cocaine (EH II, 95). Tony also introduced Moss to Jose so they could get drugs. Jose allegedly told Moss that he would "hook him up" with a contact in Mexico to obtain drugs (EH II, 97). Moss allegedly told Tony that he went to Mexico to make a contact to buy cocaine. Tony said he had Moss meet with a guy in Texas and told him to give Moss cocaine (EH II, 98).[15] Moss allegedly told Tony that he gave a guy some money in Texas to get a car fixed up with a hidden compartment so they

---

[15] So much for Tony not being involved in drugs and not knowing anyone in the drug business as he previously testified.

11

could bring the cocaine into the United States (EH II, 100). When Tony told Moss that the money he invested was used in the shrimp business, Moss asked for his money back. Tony returned $20,000, but Moss ended up suing him and wanted $90,000.00 (EH II, 103). Moss allegedly asked for his money back and if it was not going to be repaid, Moss would send someone to kill Tony and his family (EH II, 104). Tony reported the threat to police and his probation officer and the officer put him in touch with a federal agent (EH II, 105).[16]

On cross-examination, Tony stated that he gave a statement to a federal agent at Metro Airport about the situation with Moss. His name was Dave and he was with the DEA. He made this statement around 2011. He also spoke to Agent Hill from DEA (EH II, 108-109). Tony admitted that he has a conviction for possession with intent to deliver and he served time in a federal prison (EH II, 119). He had sought out a personal protection order (PPO) against Moss but it was denied (EH II, 121). He admitted owing Moss a lot of money (EH II, 129).[17] Tony admitted that Moss wired money directly to his shrimp supplier (EH II, 131). He denied giving Moss 1.5 ounces of cocaine and he could not recall if he told Agent Hill whether he did that or not (EH II, 144). He told Moss that he would introduce him to someone who could help Moss get cocaine. He also claimed that he told his probation officer about what he was doing with Moss (EH II, 154). He thinks the $500,000.00 amount of money he allegedly saw was around January, 2012 (EH II, 175).

## C. MAURO CERVANTES

Mauro Cervantes is employed as a police officer with the Ann Arbor Police Department. In November, 2012, he was assigned to the DEA Detroit Field Office because he is bi-lingual

---

[16] Tony testified that at one point, he went to the Patton house because Moss allegedly wanted to purchase $500K worth of cocaine and Moss had the money stored there. Tony stated that he actually saw this amount of money at the house (EH II, 106).

[17] He denied making up charges against Moss in an effort to get away from having to pay Moss back the money he owed (EH II, 129).

(EH II, 206). He listened to the conversation in Spanish between himself and Diego (EH II, 207). Officer Cervante's role in this deal was to drive a vehicle with a hidden compartment that had 10 kilos of cocaine for the purchase that was to take place with Moss (EH II, 208). On November 7, 2012, he was present at the Red Robin restaurant when Moss met Diego.  The purpose was to show Moss the 10 kilos in a trap compartment inside the vehicle (EH II, 209). Moss was there with Diego watching him open the trap door and Moss saw the kilos inside (EH II, 211). Moss appeared to be smiling and laughing and did not appear stressed out when he was meeting with Diego (EH II, 212). Two days after this meeting at the restaurant, Diego called the officer and said that Moss was ready for the purchase to take place at the Home Depot (EH II, 212). According to the officer, no one was forcing Moss into the car or telling him to get in.  He just jumped into the vehicle, Diego stood outside and the officer was seated in the driver's seat on the day of the prearranged buy (EH II, 214).  He did not throw the keys at Moss but held them up so that the other agents could see that Moss was taking possession of the keys (EH II, 220). He and Diego started walking away and heard Moss trying to start the vehicle but it was disabled. Moss never said he was waiting for someone else to pick up the van (EH II, 221).

### D. DAWN OHANIAN

Dawn Ohanian is a DEA agent and she was part of the surveillance team on the day of the arranged sale.  She had contact with Diego in the three days prior to the arrest of Moss (EH II, 223).  She was also present at the execution of the search warrant on Patton Street (EH II, 224).  She collected some photos from Patton with Moss in some of them. She also found some closing documents between Moss and a buyer for a home on Santa Clara in Detroit (EH II, 226). She found a boarding pass in Moss's name, some receipts for a tire repair on a Mercedes, and a prescription that had Moss's name on it (EH II, 227). From the cabinet, she seized suspected

crack cocaine and a digital scale (EH II, 231).[18]  She also stated that she did not know what the substance was. The scale was not preserved for fingerprints and none of the clothes that were seized were preserved for evidence purposes (EH II, 233-234).

## E. STEPHEN TRATECHAUD

Stephen Tratechaud is a detective with the West Bloomfield Police Department. He was part of the surveillance team and he was part of the crew that executed a search warrant at Moss's home in West Bloomfield.  Jay Smith was present at Moss's home (EH II, 237). He found documents showing the homeowners as Mr. and Mrs. Moss.  He also found some crack cocaine behind a couple of couches near the windows in the family room. The cocaine weighed about 23.7 grams (EH II, 238). Jay Smith was in the same room where the cocaine was found. Moss was not home. Smith was arrested (EH II, 239).

## F. JOHN HILL

John Hill is the DEA agent in charge of the case. He started working with Diego, a paid informant, in 2009 (EH II, 246). He learned that Moss wanted to buy a large amount of cocaine so he told Diego to engage Moss regarding the drug transaction (EH II, 247). The meetings between Diego and Moss were captured on videotape (EH II, 249). Diego was telling Moss that he had a source from Mexico who was giving him 50 kilos at a time, and he would front the cocaine to Moss to be paid at a later date (EH II, 252). Moss can be heard on the tape several times asking Diego to go to his house because of the color of his skin. Diego did not agree (EH II, 256). Agent Hill instructed Diego not to press Moss to do the deal because he did not want to spook Moss away. Diego was to have contact if Moss initiated contact first (EH II, 256). The deal on the 9th was to go down only if Moss showed Diego the money. The sign for this to take place was for Diego was to put his glasses on top of his head (which he did). He heard Moss tell

---

[18] Lab testing later determined it was not crack cocaine (EH II, 231).

Diego that he only had enough money for 8 kilos (EH II, 268). Agent Hill became aware in April, 2012 that Moss was involved in drug trafficking. He began to investigate Moss and looked into his personal background (EH II, 269). Moss was seen 5-10 times driving the Mercedes, even though it was registered in his mother's name (EH II, 276-281). In August, 2012, he and Agent Stewart spoke with Tony about Moss because they had received a report that Tony had made that Moss was threatening him about getting him some drugs (EH II, 283). Tony told them Moss gave him $10,000.00 to invest in his shrimp business. Moss told him to write the checks back to his wife, Tony Moss, and not in his name (EH II, 288). Tony then asked Moss for more money to buy shrimp so Moss gave him $20,000.00 and Moss apparently told him he wanted Tony to get him some drugs. Tony wanted no part of the drug business, but led Moss to believe he was working to find a source. Tony introduced Moss to a guy named Jose from Pontiac (EH II, 289). At this point in the proceedings, the courtroom was cleared and the attorneys and the Court placed something on the record in camera about the source of the information about Moss in April, 2012 (EH II, 308).[19]

On the third day of the entrapment hearing, Attorney Steingold became upset with the court and asked the judge to disqualify itself. The trial Court refused and Mr. Steingold then asked to take disqualification issue to the chief judge. The trial court allowed Mr. Steingold to proceed to the chief judge (EH III, 35).[20] On October 3, 2013, the chief judge issued an order denying the motion to have the trial court disqualified.

Thereafter, defense counsel stipulated with the People on the facts for the trial court to consider during the Petitioner's bench trial (see attached stipulation). On November 1, 2013,

---

[19] This record was sealed and continues to remain sealed.

[20] This tactic by Attorney Steingold was nothing but an opportunity to delay the start of the trial since Mr. Steingold was not ready to proceed right to a trial after the entrapment hearing (see Mr. Moss's Affidavit, attached to the Motion to Remand.

some 6 weeks after the completion of the entrapment hearing, the trial court denied the motion to

dismiss the case and found that Moss had not been entrapped (EH IV, 31). Having realized that

he had committed an egregious error in having Moss waive a jury trial, trial counsel then made

an oral motion for the trial Court to reinstate a jury trial (EH IV, 45).[21]

### III. BENCH TRIAL PROCEEDINGS

At the bench trial, only two witnesses testified: one was Agent John Stewart. Agent

Stewart gave brief testimony about using the kill switch on the van to prevent it from starting. He

also testified about going after Moss and placing him under arrest. Moss had a .40 caliber Glock

in his waistband. The other witness was Agent Hill, who testified that someone who has 10 kilos

is in the business of intending to distribute that drug to others (TR I, 1-18). The presentation of

evidence lasted less than 30 minutes. On November 22, 2013, the trial court found Moss guilty

of possession with intent to distribute over 100 grams of cocaine and felon in possession (TR II,

3-15). It was very simple to convict Moss since counsel and the People had stipulated to the facts

and the trial court conducted the entrapment hearing, where Moss confessed to committing this

crime.

### IV. SENTENCING

At sentencing, the People requested, over defense objection, the scoring of OV 14 at 10

points. This was granted (sentencing 19). The trial court denied defense counsel's objections to

---

[21]     Attorney Steingold couched the basis for the jury trial request on the basis that he had sought disqualification of the trial judge. The reality however, is that Steingold realized his serious mistake when he made Moss waive the jury trial since the trial Court sat as the fact-finder during the bench trial and was also the trier of fact during the entrapment hearing.

the scoring of OV 19 at 10 points. Petitioner was then sentenced to a term of 15-45 years, plus 2 years, consecutive, for the felony-firearm.

## V. *GINTHER* HEARING

After being convicted and sentenced, Petitioner appealed. As part of this appeal and through counsel, Petitioner filed a Motion to Remand For A *Ginther* Hearing. The Court granted the Motion to remand on or about October 16, 2014. The *Ginther* hearing was held on November 21, 2014. Following the *Ginther* hearing, the trial court issued an Opinion and Order Denying Petitioner's Motion For New Trial on or about December 11, 2014.

### A. ATTORNEY DAVID STEINGOLD

Attorney Steingold testified that he has been a criminal defense attorney, practicing for about 35 years (GH, 5).[22] Mr. Moss came to his office with his uncle seeking representation. He was paid an initial $3,000 retainer fee, even though he wanted $20,000.00. He did not receive the balance of his fee (GH, 6). The attorney entered a form appearance on the case on September 6, 2013. He knew when he took the case that a trial date had been set and he also knew that the court would not agree to change that date, because he was now the fifth attorney on the case (GH, 7-10).

He knew that the entrapment hearing was set for September 16, 2013 and the trial was set to start on September 17, 2013 before he took the case (GH, 13). He told Mr. Moss to waive his jury trial on the first day of the entrapment hearing because Mr. Moss had no defense at trial, other than entrapment (GH, 18-20). He did not really address the issue of whether he explained to Mr. Moss what a waiver of a jury would mean vis-à-vis that the Judge (who was hearing the testimony at the entrapment hearing) would also sit as a fact-finder at the trial (GH, 26). Attorney

---

[22] The *Ginther* Hearing transcript is referenced as "GH".

Steingold acknowledged that in order to present the entrapment defense, Mr. Moss would have to admit his involvement in the offense (GH, 28-29).

Even though the trial was set to start right after the entrapment hearing, it did not commence because Mr. Steingold filed a motion to disqualify the trial judge. That motion was denied and then he appealed the decision to the chief judge. The chief judge denied his motion for disqualification as well (GH, 30). The trial lasted for about 20 minutes and it was submitted on stipulated facts (GH, 30). **Attorney Steingold testified that he asked for a jury trial, after his motion was denied, at the Petitioner's request, since Mr. Moss wanted to make it hard on the judge** (GH, 31).[23] Although Mr. Steingold stated that Mr. Moss had no defense, he still believed in the client's innocence (GH, 32).

Mr. Steingold also admitted that he did not seek an interlocutory appeal once the entrapment motion was denied because he had not been paid, even though he knew that Mr. Moss would be convicted at trial (GH, 33). He also claimed that he did not file a motion to withdraw since he was not getting paid because he knew that the judge would deny the motion (GH, 34).

## B. STEVEN MOSS

His uncle ended up hiring Mr. Steingold, and at first, he seemed gung-ho about the case and promised to take care of business (GH, 64). During the first day of the entrapment hearing, Mr. Steingold took him into the hall and told him that it is best to have a bench trial because he would not be ready to start with a jury and the attorney also believed that he could get more time to prepare if it was a bench trial (GH, 66). Mr. Steingold never told him that in a bench trial, the same judge hearing the testimony at the entrapment hearing would be the same judge deciding

---

[23] It is a remarkable statement that an attorney would go along with a client's request to reinstate the jury trial just to make it hard on the judge.

his guilt or innocence at the bench trial (GH, 66-67). Had he known this, he would have never waived a jury (GH, 67). After the entrapment motion was lost, the attorney came to him and said a jury would be better because the judge does not like Mr. Steingold and she may take it out on Mr. Moss (GH, 67). Mr. Steingold tried to reinstate a jury trial, but his request was denied (GH, 68).

Mr. Moss further testified that he had no knowledge that Mr. Steingold had stipulated to the use of certain facts and exhibits at trial until the trial started (GH, 69).[24] Mr. Moss had witnesses that he wanted called to the trial and Mr. Steingold would not even speak with them (GH, 69-70). After the entrapment motion was denied, Mr. Steingold said he wanted $25,000.00 by the next day to pursue an interlocutory appeal. Mr. Moss's uncle offered the attorney $5,000.00, but Mr. Steingold refused (GH, 70).[25]

At the entrapment hearing, he admitted his involvement in the offense and offered reasons as to why he felt he was entrapped (GH, 72). He does not believe that he received a fair trial since it was the same judge that decided the motion that decided his guilt or innocence (GH, 73).[26]

Mr. Moss further testified that if he had had a jury trial, then the jury would not have heard everything that the judge heard at the entrapment hearing (GH, 78). Mr. Steingold realized his mistake about the jury trial waiver and then requested a jury trial after the judge denied the entrapment motion (GH, 79). Mr. Moss had several witnesses who would verify that he was entrapped: Eric Lowe, Barry Brannon, Michael Clark and Ellis Exton (GH, 79). These witnesses

---

[24] It should be no surprise that Mr. Steingold would stipulate to such an arrangement since he was not getting paid and he did not want to do any more work for the client.
[25] The attorney tried to take advantage of Mr. Moss by asking for that kind of money since the entrapment defense was very important in this case. It was at this point that Mr. Steingold should have asked to withdraw and advise the court that the client was not paying him.
[26] Mr. Moss also believes that his attorney knew that he would not receive a fair trial before the judge and that is why he tried to get back the jury trial (GH, 73).

would have supported his entrapment defense and would have testified as to how many times informant Bennett had come around and pressured him into this drug deal (GH, 80). These witnesses would have also testified that Bennett also tried to lure them into drug deals and tried to convince them to participate (GH 81).

Mr. Moss continued to maintain during the *Ginther* hearing that his attorney had pressured him to waive the jury trial (GH, 84). Mr. Moss stated that he did get into the van at the Home Depot, but he never handed any money over and he never saw anything that was in the van (GH, 92). Bennett was supposed to come and get the van and he had money in a suitcase that he was loaning to Bennett (GH, 93). He did not know that there was a large amount of cocaine in the van. He learned later after he was arrested (GH, 94).[27]

Finally, Mr. Moss believes that he is not guilty of the offense since he was never in possession of the van that had the cocaine. If he had a jury trial and witnesses testified, he could have shown that he was not in possession of any drugs (GH, 96-100).

Following the *Ginther* hearing, the trial court denied the motion, finding that Petitioner was not denied the effective assistance of counsel.

10.     The following are the grounds Petitioner presents as the basis for habeas relief:

## I.

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO BE REPRESENTED BY AN ATTORNEY WHO WOULD SUBJECT THE PROSECUTION'S CASE TO MEANINGFUL ADVERSARIAL TESTING WHEN HIS ATTORNEY AGREED TO A STIPULATED FACT TRIAL WITHOUT PETITIONER'S AUTHORIZATION, CONCEDED THAT "THE CRIME OCCURRED," AND WAIVED OPENING STATEMENT AND CLOSING ARGUMENT**

---

[27] All of this was explored at the entrapment hearing.

There are three types of cases which lead to a presumption of prejudice under *United States v Cronic,* 466 US 648 (1984):

> "The first is the complete denial of counsel, in which the accused is denied counsel at a critical stage. The second is when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance."

*Mitchell v Mason,* 325 F3d 732, 792 (6th Cir 2003) (citations and quotations marks omitted). Petitioner's argument focuses on the second type of case, where his trial court attorney failed to subject the government's case to meaningful adversarial testing. Such a "constructive denial of counsel is limited to situations involving constitutional error of the first magnitude, which cannot be cured even if no prejudice is shown." *Moss v Hafbauer,* 286 F3d 851, 860 (6th Cir 2002).

In the case at bar, counsel completely surrendered to the prosecution when he failed to challenge the prosecution's case and instead conceded that "the crime occurred" (TRIAL TRANSCRIPT, hereinafter "T" 11-22-13, 4), as part of his unauthorized "stipulated fact" trial. Although Petitioner agreed to have a bench trial, (HEARING TRANSCRIPT, hereinafter "HT", 9-16-13, 130-131), Petitioner never agreed to a "stipulated fact" trial and certainly never authorized counsel to completely concede guilt. There is absolutely nothing on-the-record that proves that Petitioner knowingly, intelligently, and voluntarily agreed to his trial court counsel's completely conceding guilt by means of a "stipulated fact" trial.

Petitioner was under the impression that he would have a trial before the trial court judge and he would be represented by counsel who, consistent with his "not guilty" plea, would hold the prosecution to its full duty to present evidence, subject to his attorney's meaningful

adversarial testing, to prove his guilt beyond a reasonable doubt.  Instead Petitioner received just the opposite.  His attorney "agree[d] to waive opening statements for the purposes of the bench trial . . ." (T 11-18-13, 3).  Counsel waived cross-examination of one of the two live witnesses the prosecution actually proved at trial.  (T 11-18-13, 7).  Although counsel voir dired and cross-examined the prosecution's second live witness, he eventually conceded to the trial court that there was no need for "an expert to find that [Petitioner] intended to sell [the ten kilos]."  (T 11-18-13, 15).

Of course, an expert was not needed for the trial court to return a guilty verdict, because counsel had already conceded through stipulation that "the crime occurred."  When a Petitioner's defense counsel stipulates that "the crime occurred" the trier of fact does not need anything else because the confession by counsel is dispositive.  The prosecution realized this and capitalized on this during its unopposed closing argument by repeatedly emphasizing that the "evidence shows by virtue of the stipulations" that "all of the facts have been established:"

> **Ms. Hand:**    Judge, briefly.  I believe the evidence shows <u>by virtue of the stipulations</u> as well as the brief testimony here today that on November 9[th], 2012, in Oakland County, the Petitioner did have in his possession ten kilograms of cocaine, which is over a thousand grams of cocaine based on the lab report.  And that he did intend to distribute it to somebody at some point in the future.  And at the time he did so he had a gun in his possession which is the substance of Count II.  He did possess a firearm during the commission of that felony.
>
> I'd reserve any – <u>I believe all of the facts have been established through the stipulations</u> as well as the additional testimony today.  And I'd reserve any additional argument for my rebuttal, Judge.
>
> (T 11-18-13, 26-27).

The prosecutor took full advantage of the fact that counsel stipulated that "the crime occurred" by making it clear to the trial court that stipulation alone established "all of the facts . . ." Further evidence of counsel's complete failure to subject the prosecution's case to meaningful adversarial testing is the fact that counsel completely surrendered Petitioner's right to closing argument by informing the trial court that he had nothing to say:

> **THE COURT:** Mr. Steingold.
>
> **MR. STEINGOLD:** I have nothing, your Honor.
>
> (T 11-18-13, 27).

In reaching its decision the trial court judge as trier of fact relied on the fact that counsel: "stipulated to the fact that the crime occurred . . ." (T 11-22-13, 4).

Where trial court counsel confessed that "the crime occurred" without Petitioner's authorization, waived opening statement, and waived closing argument, there is no way possible to conclude that Petitioner was represented by an attorney who subjected the prosecution's case to meaningful adversarial testing.    Prejudice must be presumed where Petitioner was constructively deprived of counsel.  Reversal is required.

**Discussion:**

In a criminal prosecution, "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland v Washington,* 466 US 668, 690 (1984).  The Court in *People v Krysztopaniec,* 170 Mich App 588, 595 (1988) (citing *Wiley v Sowders,* 647 F2d 642, 650 (6th Cir 1981) held that:

> "a Petitioner is deprived of the effective assistance of counsel when his lawyer admits the client's guilt without first obtaining the client's consent to this strategy."
>
> *Id.*

23

Here, counsel had no authority without Petitioner's permission to enter into a "stipulated fact trial" where counsel just did not merely stipulate to certain facts but outright conceded that "the crime occurred," waived opening statement, failed to cross-examine one of the two live witnesses, and ultimately waived closing argument.  Petitioner did not sign the "stipulated fact" document nor did he ever on-the-record (or off-the-record for that matter) agree to a stipulated fact trial where his attorney would essentially plead him guilty and surrender all of his constitutional rights.

Counsel's actions in this case are far more aggressive than those of the attorney in *Brookhart v Janis*, 384 US 1, 6-7 (1966).  In *Brookhart, supra*, defense counsel had agreed to a "prima facie" bench trial at which the State would be relieved of its obligation to put on "complete proof" of guilt or persuade the trier of fact of the Petitioner's guilt beyond a reasonable doubt.  *Id.* at 7.  The Court held that counsel lacks authority to consent to a guilty plea on a client's behalf.  *Id.* at 6-7.  Furthermore, a Petitioner's silence and lack of affirmative explicit acceptance is insufficient to render the plea valid.  *Boykin v Alabama,* 395 US 238, 242 (1969).

Counsel failed to subject the prosecution's case to meaningful adversarial testing and therefore the presumption of prejudice is attached. Reversal is required.

## II.

**PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL OF CHOICE DURING SEVERAL CRITICAL STAGES OF THE PROCEEDINGS AND DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS RIGHT TO BE REPRESENTED BY HIS RETAINED COUNSEL, STEINGOLD, WHEN HE WAS REPRESENTED BY NON-RETAINED ATTORNEY DWYER WITHOUT AUTHORIZATION**

24

In the "fee agreement" (*See* Fee Agreement, attached as Appendix A) Petitioner retained "Attorney David S. Steingold" and "only" he:

> "Attorney David S. Steingold for legal representation and for the performance of <u>all</u> necessary legal and related services in connection with said representation.  Representation is for client's charge of possession with intent to deliver in Oakland County."

> (*See* Appendix A, paragraph 1) (emphasis added).

As the "fee agreement" reflects, Petitioner exclusively chose Attorney David S. Steingold to "[perform] . . . all necessary legal and related services . . ." and no one else.

Mr. Steingold's testimony from the post-conviction evidentiary hearing also reflects that he and only he was retained to represent Petitioner:

**BY MS. SUZANNA KOSTOVSKI**

> **Q:** Okay.  And can you tell the Court how you came to represent Steven Moss?

> **A:** He came to my office, along with a gentleman named Solomon Israel, and asked me to represent him.

> **Q:** Okay.  And you were retained, is that correct?

> **A:** I was retained.

> (GINTHER HEARING TRANSCRIPT, hereinafter "GHT", 11-21-14, p 6)

Despite Mr. Steingold being retained as Petitioner's counsel of choice, Mr. Steingold decided to pass the buck to another attorney by the name of Lisa Dwyer who was not an associate, partner, or otherwise contractually approved surrogate for Mr. Steingold:

**BY MS. SUZANNA KOSTOVSKI:**

> **Q:** Okay.  That's fine.

Now, you – you obviously, you and your associate, Lisa Dwyer, conducted the entrapment hearing in this case?

**A:** <u>She's not my associate.</u>

**Q:** Okay.  Is she your partner?

**A:** <u>No.</u> She's her own attorney and I'm an attorney.  We are now in the same office; we weren't at the time.  <u>But we are not in a partnership of any kind.</u>

**Q:** Okay.  Well, she was working with you on this case?

**A:** Yes.

**Q:** Okay.  And she and you conducted this entrapment hearing?

**A:** That's correct.

(GHT, 11-21-14, p 17) (emphasis added).

Despite Mr. Steingold being Petitioner's retained counsel of choice and notwithstanding the agreement that Mr. Steingold himself would perform "all necessary legal and related services in connection with" this case, Attorney Lisa L. Dwyer was entrusted with significant duties concerning Petitioner's entrapment defense.  On September 16, 2013, Ms. Dwyer was placed in charge of developing Petitioner's testimony to support his sole defense of entrapment, and was in control of calling Petitioner and handling direct examination of Petitioner.  (ENTRAPMENT EVIDENTIARY HEARING TRANSCRIPT, hereinafter "EEHT", 9-16-13, pp 8-75).

Not only was Ms. Dwyer, an unknown and unwanted attorney, left in complete control of a critical portion of the entrapment evidentiary hearing, Mr. Steingold abandoned Petitioner completely on the second day of trial and left him solely in the hands of Ms. Dwyer.  (T 11-22-13, 3-16).  To the extent that Petitioner was left represented by Ms. Dwyer and not his retained

counsel of choice Mr. Steingold, Petitioner was deprived of a structural right requiring automatic reversal.   The lack of representation by Mr. Steingold and Mr. Steingold alone during these critical stages of the proceedings resulted in Petitioner being deprived of his right to be represented by retained counsel of choice.

**Discussion:**

One element of the Sixth Amendment right to counsel is the right of a Petitioner who does not require appointed counsel to choose who will represent him or her.   *United States v Gonzalez-Lopez,* 548 US 140, 144 (2006) (citing *Wheat v United States,* 486 US 153, 159 (1988)).  Indeed, "[t]he Sixth Amendment guarantees the Petitioner the right to be represented by an otherwise qualified attorney whom that Petitioner can afford to hire, or who is willing to represent the Petitioner even though he is without funds."   *Id.* (citing *Caplin & Drysdale, Chartered v United States,* 491 US 617, 624-25 (1989)).   Where a criminal Petitioner's right to be assisted by counsel of one's choice is wrongly denied, it is unnecessary for a reviewing court to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.   *Id.* at 148:

> "Deprivation of the right is 'complete' when the Petitioner is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."

> *Id.*

Where Petitioner retained Mr. Steingold and only Mr. Steingold to conduct "<u>all</u> necessary legal and related services in connection with" this case he was erroneously prevented from being represented by the lawyer he want[ed]," *Gonzalez-Lopez,* 548 US at 148, when Ms. Dwyer was left in-charge of important legal duties such as conducting the critical entrapment hearing and exclusively representing Petitioner on the second day of trial.

<u>Finally, there is nothing in the record to prove that Petitioner knowingly, intelligently, and voluntarily waived his right to be represented in total by his retained counsel of choice, Mr. Steingold, and somehow instead agreed to be represented by Ms. Dwyer</u>.  A waiver of a right to be represented by counsel of choice cannot be presumed from a silent record.  *See Burgett v Texas,* 389 US 109, 114-15 (1967); *Carnley v Cochran,* 369 US 506, 516 (1962).

Since Petitioner was deprived of his right to be represented completely by his counsel of choice during critical stages of the proceedings, reversal of his convictions is automatic.

### III.

**WHERE THE PROSECUTION'S CASE RELIED SOLELY ON WITNESS TESTIMONY, COUNSEL'S COMPLETE FAILURE TO CONDUCT PRETRIAL PREPARATORY INVESTIGATIVE INTERVIEWS OF ANY OF THE PROSECUTION'S WITNESSES CONSTRUCTIVELY DEPRIVED PETITIONER OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL BECAUSE COUNSEL WAS UNABLE TO SUBJECT THE PROSECUTION'S CASE TO ANY MEANINGFUL ADVERSARIAL TESTING**

In *Taylor v Illinois,* 484 US 400; 108 SCt 646, 656; 98 L.Ed.2d 798 (1988), the United States Supreme Court held  that trial counsel, to be adequately prepared, must at least locate and interview witnesses that are to be called at trial:

> "Routine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those   whose testimony will be offered at trial."

> *Taylor,* 108 SCt at 656.

*Kimmelman v Morrison,* 477 US 365; 106 SCt 2574; 91 L.Ed.2d 305 (1986) explained that when defense counsel fails to investigate the prosecution's case the adversarial testing process is prone to malfunction:

> "In making the competency determination, the court "should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.,* [*Strickland v Washington,* 466 US 668, 690, 80 L.Ed.2d 674, 104 SCt 2052 (1984)]. **Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case** and into various defense strategies, we noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.,* at 691, 80 L.Ed.2d 674, 104 SCt 2052.

> *Kimmelman,* 477 US at 385, 106 SCt 2574.

The present case does not involve an attorney's failure to investigate and interview one, two, or even three witnesses, but a <u>wholesale</u> failure to conduct *any* pretrial preparatory investigative interviews of *any* of the prosecution's witnesses, where the prosecution's case consisted *only* of witness testimony.

In *Eldridge v Atkins,* 665 F2d 228, 236 (8th Cir 1981), the Court concluded that counsel was constitutionally ineffective for failing to interview any of the prosecution's witnesses, that counsel owed a duty to his client "to investigate and interview all eyewitnesses to the robbery," and that not to interview prosecution witnesses "was an absurd and dangerous policy:"

> "In *McQueen v Swenson,* 498 F2d 207 (8th Cir 1974), and *Thomas v Wyrick,* 535 F2d 407 (8th Cir 1976), this court examined defense counsel's custom of not interviewing prosecution witnesses. In *McQueen,* this Court found that this **"absurd and dangerous policy"** contravened the attorney's essential duty to make an adequate factual investigation and could only be viewed **"as an abdication – not an exercise – of his professional judgment."** 498 F2d at 216.

> *Eldridge,* 665 F2d at 236.

29

The following are the names of potential witnesses the prosecution indicated long before trial that it would possibly present at trial:

Anthony Rodriguez
Mauro Cervantes
Dawn Ohanian
Stephen Tratechaud
Douglas Stewart
John Hill

Despite being fully aware of the foregoing witnesses' existence and identities, counsel never bothered to investigate or conduct pretrial preparatory investigative interviews of any of these witnesses.

Since the prosecution's case relied only upon witness testimony, counsel's failure to investigate and conduct investigative pretrial preparatory interviews of *any* of these witnesses is a failure to subject any of the prosecution's case to meaningful adversarial testing. Since there was no DNA, no confession, and no physical evidence of any kind connecting Petitioner Moss to the alleged offenses, even the most inexperienced counsel would be on notice that the only effective way to challenge the prosecution's case was to challenge the witnesses' versions of events. Without interviewing any of these witnesses prior to trial, counsel was indisputably ill-prepared to challenge the prosecution's case during both the pretrial proceedings and during the trial itself. Counsel was constitutionally obligated to at least investigate and interview these witnesses before the prosecution called them to testify; it is difficult to imagine any function defense counsel is more required to fulfill than to fully prepare to and execute a competent adversarial testing of the prosecution's proofs. Without such investigation to prepare to competently test those proofs, "winging it," or hoping for "F. Lee Bailey" impromptu "on-the-fly," impeachment is a choice to deliberately fail, perhaps the only real choice that counsel made

here.   That decision precluded implementation of any potential defense strategy, because the

basic means to develop, evaluate, implement, or reject any defense strategy were unavailable as a

result of failure to investigate.

Counsel's gross negligence is a constructive denial of counsel, due to the wholesale

failure to investigate the prosecution witnesses, in violation of the Sixth Amendment right to

effective assistance of counsel, and prejudice is automatically attached.    Petitioner is entitled to

relief under *United States v Cronic, infra*.

**Discussion:**

Both the Michigan and the United States Constitutions require that a criminal Petitioner

enjoy the assistance of counsel for his or her defense.  *Const 1963, art 1, §20; US Const Am VI*.

The test for evaluating claims of constructive absence of counsel was set forth in *United*

*States v Cronic,* 466 US 648; 104 SCt 2039; 80 L.Ed.2d 657 (1984).  The Petitioner must show a

deficiency of counsel stemming from the structure of the proceeding.  A showing of prejudice is

not necessary.  *Mitchell v Mason,* 325 F3d 732, 741-42 (6th Cir 2003), *cert denied* ___ US ___,

125 SCt 861, 160 L.Ed.2d 824 (2005).  Instead, a presumption of prejudice exists because it is

unlikely that any lawyer could provide effective representation under such circumstances.

*Cronic,* 466 US at 660; 104 SCt 2039.   Application of *Cronic's* presumption-of-prejudice

analysis is warranted where: (1) There is a complete denial of counsel at a critical stage; **(2)**

**Counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;**

and (3) Counsel placed himself in circumstances in which even a fully competent attorney could

not render effective assistance.  *Id.* at 659; 104 SCt at 2039.

The Michigan Supreme Court in *People v Trakhtenberg,* 493 Mich 38, 826 NW2d 136 (2012), mandated that counsel engage in the minimum required investigative measures by interviewing witnesses:

> "Counsel always retains the 'duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"

*Id.* (quoting *Strickland v Washington,* 466 US 668, 690-691; 104 SCt 2052; 80 L.Ed.2d 674 (1984).

The duty to investigate encompasses "all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v Smith*, 395 F3d 251, 258 (6th Cir 2005) (citing *Bryant v Scott,* 28 F3d 1411, 1419 (5th Cir 1994)). The '[c]entral teaching of *Strickland* . . . [is] that the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Ramonez v Berghuis,* 490 F3d 482, 488 *(2007).* Ignorance stemming from lack of investigation precludes the formation of sound trial strategy, because sound trial strategy decisions are impossible where not enough is known to choose or eliminate certain investigatory avenues, and where even the existence of differing strategic alternatives is unknown. Therefore, trial counsel "must develop trial strategy . . . based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of full investigation." *Id.* at 489.

Nor can a sound trial strategy be developed simply by reading the prosecution's file, *i.e.,* police reports and witnesses' statements. This has been squarely rejected. In *Stanley v Bartley,* 465 F3d 810, 812-814 (7th Cir 2006) the trial attorney claimed to have "prepared for trial by reading the statements that prospective witnesses had given to the police." *Id.* at 812. Trial

counsel conceded that he "did not interview any of [the witnesses] . . . before the trial began." *Id.* Trial counsel's trial strategy "was to listen to the witnesses' direct testimony and cross-examine them regarding any discrepancies between that testimony and their pretrial statements that were harmful to his client." *Id.* The Court held that counsel's performance was "a shocking dereliction," prejudicial, and reversed the convictions:

> "**To fail to interview any witnesses or prospective witnesses was a shocking dereliction of professional duty** in a case in which the state's evidence, though sufficient to convict the Petitioner of murder beyond a reasonable doubt, was far from compelling. *Davis v Lambert,* 388 F3d 1052, 1064 (7th Cir 2004); *Washington v Smith,* 219 F3d 620, 633-34 (7th Cir 2000); *Montgomery v Petersen,* 846 F2d 407 (7th Cir 1988); *Anderson v Johnson,* 338 F3d 382, 383-94 (5th Cir 2003); *Lord v Wood,* 184 F3d 1083, 1095-96 (9th Cir 1999); *United States v Gray,* 878 F2d 702, 713-14 (3rd Cir 1989). **The lawyer could not know how complete or accurate a prospective witnesses' statement to the police was without talking to the witness."**

> *Stanley,* 465 F3d at 813.

Since counsel's failure to investigate was complete, counsel's inability to subject the prosecution's case to meaningful adversarial testing was also complete, warranting *Cronic's* presumption of prejudice. Automatic reversal is required.

IV.

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AND HAS GOOD CAUSE FOR FAILING TO RAISE THE CONSTITUTIONAL VIOLATIONS SET FORTH WITHIN ON DIRECT APPEAL**

Although the issues set forth within this pleading were available for appellate counsel to raise, counsel neglected to raise these significant, obvious and meritorious constitutional violations. Raising any of the issues could have changed the outcome of the direct appeal.

33

These constitutional violations are far stronger than the issues raised by counsel on direct appeal. Their inexplicable omission constitutes ineffective assistance of appellate counsel. Prejudice resulted because had these constitutional violations been raised on direct appeal there is no question that at least one of them could and would have been found meritorious by the Court of Appeals and resulted in a different outcome.

**Discussion:**

A criminal Petitioner is guaranteed effective assistance of appellate counsel by the Due Process Clause of the United States Constitution (US Const Am XIV). *Halbert v Michigan,* 545 US 605 (2005); *Evitts v Lucey,* 469 US 387, 399-401; 105 SCt 830; 83 LEd2d 821 (1985).

"Cause" for excusing procedural default is established by proving ineffective assistance of appellate counsel. *People v Reed,* 449 Mich 375, 378; 535 NW2d 496 (1995). Petitioner meets the standard for "cause." While an appellate attorney can winnow out the issues that the appellate attorney deems to be weaker issues, it is evident that the issues raised by appellate counsel were unsuccessful. The issues raised herein are markedly stronger constitutional violations, compared to some of the issues raised by appellate counsel on direct appeal, and for this reason Petitioner received ineffective assistance of appellate counsel.

When an attorney presents one argument rather than another, a federal habeas corpus petitioner must demonstrate that the issue or issues not presented "was clearly stronger than issues that counsel did present." *Caver v Straub,* 349 F3d 340, 348 (6th Cir 2003) (quoting *Smith v Robbins,* 528 US 259, 289; 120 SCt 746; 145 LEd2d 756 (2000)). Counsel's failure to raise an issue on appeal is ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *Howard v Bouchard,* 405 F3d 459, 485 (6th Cir 2005).

Nor will any convincing argument of "appellate strategy" to omit these issues be made successfully. The issues are supported by proofs that would have been devastating at trial. Moreover, appellate counsel was afforded the opportunity by letter from undersigned counsel inviting his participation, cooperation, and explanation of his deficient performance, but counsel declined to explain or participate.

After analyzing the constitutional violations set forth within, Petitioner is confident that this Honorable Court will find that the constitutional violations raised herein are far more meritorious than the issues raised by counsel on direct appeal, and consequently conclude that Petitioner received ineffective assistance of appellate counsel.

### RELIEF REQUESTED

WHEREFORE, for the foregoing reasons, Petitioner Steven Lee Moss respectfully prays that this Honorable Court enter an Order/Judgment:

A. That Respondent be required to appear and answer the allegations of this Petition.

B. That this Court grant oral argument in this matter.

C. That this Court grant an evidentiary hearing on any claim in which additional factual development is necessary.

D. That after full consideration, this Court relieve Petitioner of the unconstitutional restraint of his liberty.

LAW OFFICES OF DAVID L. MOFFITT
& ASSOCIATES

/s/ David L. Moffitt

_____

By David L. Moffitt (P30716)
Attorney for Petitioner Steven Lee Moss

Dated: 5-30-18

## CERTIFICATE OF SERVICE

I certify that on 5-30-18 the foregoing document was caused to be served on all counsel of record through the CM/ECF Filing System.

LAW OFFICES OF DAVID L. MOFFITT
& ASSOCIATES

/s/ David L. Moffitt

_____

By: David L. Moffitt (P30716)
Attorney for Petitioner Steven Lee Moss

## TABLE OF APPENDICES

Appendix A    Opinion and Order of 4-26-17 of the trial court

Appendix B    3-15-18 Order of the Court of Appeals

Appendix C    Fee Agreement

Appendix D    Oakland County Register of Actions

1

Appendix A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff,

                                      Case No. 2013-244474-FC

v.

                                      Hon. Martha D. Anderson

STEVEN LEE MOSS,

        Defendant.

_____/

## OPINION AND ORDER

      This matter is before the Court on Defendant's Motion for Relief from Judgment, Pursuant to MCR 6.500, *et seq.* Pursuant to MCR 2.119(E)(3), MCR 6.508(A) and MCR 6.508(B), there will be no oral argument.

      Following a bench trial, on November 22, 2013, the Court found Defendant guilty of possession with intent to deliver 1,000 or more grams of cocaine, contrary to MCL 333.7401(2)(a)(i), and possession of a firearm during the commission of a felony (felony-firearm), contrary to MCL 750.227b. Consequently, on January 6, 2014, the Court sentenced Defendant to 15 to 45 years' imprisonment for the possession with intent to deliver cocaine conviction and two years' imprisonment for the felony-firearm conviction (consecutively to be served), with 53 days' jail credit.

      Following Defendant's subsequent appeal, on June 9, 2015, the Michigan Court of Appeals affirmed Defendant's conviction and sentence. See, *People v Moss*, unpublished per curiam opinion of the Court of Appeals dated June 9, 2015 (Docket No. 319954). Thereafter, on December 22, 2015, the Michigan Supreme Court denied Defendant's Application for

Leave to Appeal. See, *People v Moss*, Order of the Michigan Court of Appeals dated December 22, 2015 (Docket No. 152082).

Defendant now brings the pending Motion for Relief from Judgment under MCR 6.500, *et seq.*

I.

The Michigan Court of Appeals set forth the facts of this case as follows:

> Defendant's convictions arise from his purchase of 10 kilograms of cocaine from a police undercover informant. After learning that defendant was interested in acquiring a large amount of cocaine and after conducting preliminary surveillance of defendant's activities, the police arranged for defendant to meet their informant. In addition to the police testimony, the prosecution presented evidence of video and audio recording capturing the meetings and telephone conversations between defendant and the informant. The first meeting, on November 6, 2012, lasted approximately 30 minutes and defendant agreed to purchase 10 kilograms of cocaine. At their next meeting on November 7, 2012, defendant and the informant discussed the drug deal, and defendant unsuccessfully attempted to persuade the informant to increase the purchase amount to 40 kilograms. In a restaurant parking lot, the informant showed defendant 10 kilograms of cocaine that were hidden in a compartment of an undercover police van. Defendant was instructed to contact the informant if he wanted to consummate the deal. Defendant contacted the informant on November 8, 2012, and they agreed to meet at a restaurant. They then agreed to transact the drug deal on November 9, 2012, which was when defendant believed he would have all the purchase money. Defendant unsuccessfully attempted to convince the informant to complete the transaction at defendant's house. Defendant also discussed his desire for future transactions with the informant. On November 9, 2012, defendant and the informant met in a parking lot of a Home Depot store, as planned. The informant was accompanied by another undercover officer who drove the van containing the drugs, and defendant also brought an associate with him. After defendant showed that he had the purchase money, which was in a suitcase in his car, the men walked to the undercover van where defendant was again shown the product. Defendant took possession of the van keys,

2

got in the driver's seat, and turned on the ignition before the police remotely disabled the van. Defendant fled the vehicle on foot, but was arrested after a brief chase. [*People v Moss*, unpublished opinion per curiam of the Court of Appeals dated June 9, 2015 (Docket No. 319954).]

II.

Post-conviction relief under MCR 6.500, *et seq* is an extraordinary remedy that is appropriate only to prevent manifest injustice. *People v Reed*, 449 Mich 375, 388; 535 NW2d 496 (1995). Defendant has the burden of proving entitlement to the relief requested. MCR 6.508(D). This Court may not grant a motion for relief from judgment that alleges grounds for relief, other than jurisdictional defects, that could have been raised on appeal or in a prior motion, unless the defendant demonstrates both "good cause" for failure to raise the issue and "actual prejudice" from the alleged irregularities that support the claim of relief. MCR 6.508(D)(3). If either "good cause" or "actual prejudice" is lacking, this Court need not address the other prong before denying the motion. *People v Jackson*, 465 Mich 390, 405-06; 633 NW2d 825 (2001).

Under MCR 6.508(D)(3)(a), good cause for failing to raise an issue on appeal may be established by showing that an external factor prevented the defendant from raising the issue earlier or by proving ineffective assistance of appellate counsel. *Reed, supra* at 378. Here, Defendant argues that ineffective assistance of appellate counsel excuses his failure to raise on appeal the issues he now raises in this motion for relief from judgment. The standard for ineffective assistance of appellate counsel is the same as that for trial counsel. *People v Pratt*, 254 Mich App 425, 430; 656 NW2d 866 (2002). Thus, to prove ineffective assistance of appellate counsel, Defendant must show that appellate counsel's performance fell below an objective standard of reasonableness and that, as a result, Defendant was

3

prejudiced. *People v Pickens,* 446 Mich 298, 302-303, 312-324; 521 NW2d 797 (1994). To establish the prejudice required for an ineffective assistance of counsel claim, Defendant must show a reasonable probability that the outcome would have been different but for counsel's errors. *People v Grant,* 470 Mich 477, 486; 684 NW2d 686 (2004).

In a conviction following a trial, "actual prejudice" means that "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(i). "Actual prejudice" may also be found where "the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case." MCR 6.508(D)(3)(b)(iii).

III.

Defendant first argues that he was denied the effective assistance of counsel at trial because defense counsel failed to subject the prosecution's case to meaningful adversarial testing. Specifically, Defendant contends that defense counsel improperly stipulated to all of the facts necessary to convict him of the charged crimes, that defense counsel failed to cross examine one of the prosecutor's two witnesses, and that defense counsel waived an opening statement and closing argument. Defendant further argues that defense counsel failed to investigate or interview any potential witnesses before trial.

Most claims of ineffective assistance of counsel are reviewed according to the two-part test set forth in *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), under which the defendant has the burden to show (1) that counsel's performance fell below objective standards of reasonableness, and (2) that it is reasonably probable that the results of the proceeding would have been different had it not been for counsel's error.

4

*Id.* at 687, 690, 694. When counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," however, prejudice is presumed for the purpose of establishing a claim of ineffective assistance of counsel. *United States v Cronic*, 466 US 648, 659-660; 104 S Ct 2039; 80 L Ed 2d 657 (1984); *People v Frazier*, 478 Mich 231, 243, n 10; 733 NW2d 713 (2007). "The *Cronic* test applies when the attorney's failure is *complete*, while the *Strickland* test applies when counsel failed at specific points of the proceeding." *Frazier, supra* at 244.

While Defendant argues that the *Cronic* standard applies in this case, the record in this case does not reflect a "complete" failure of counsel. Defense counsel explained at the *Ginther*[1] hearing that, given the evidence against Defendant, which included recorded telephone calls between Defendant and the informant and audio/video recordings of Defendant's meetings with the informant, the defense strategy was to focus on an entrapment defense, which was presented to the Court in a pretrial motion to dismiss. After the Court denied the motion to dismiss, the strategy was to have a stipulated-fact bench trial in an attempt to expedite an appeal of the Court's denial of the motion to dismiss on the basis of entrapment.

In light of the overwhelming evidence against Defendant, this Court cannot conclude that defense counsel failed to subject the prosecutor's case to meaningful adversarial testing where counsel made a strategic decision to focus on an entrapment defense rather than a futile attempt to challenge Defendant's factual guilt. *People v Walker*, 167 Mich App 377, 382; 422 NW2d 8 (1988), overruled in part on other grounds by *People v Mitchell*, 456 Mich 693, 698; 575 NW2d 283 (1998)("Where the evidence obviously points to

---

[1]    *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

defendant's guilt, it can be better tactically to admit to the guilt and assert a defense or admit to guilt on some charges but maintain innocence on others.") Therefore, Defendant's ineffective assistance of counsel claims will be reviewed under the *Strickland* standard, rather than the *Cronic* standard.

Defendant argues that defense counsel was ineffective because he waived an opening statement and closing argument at trial and failed to cross-examine one of the prosecutor's witnesses. Again, defense counsel explained at the *Ginther* hearing that the defense strategy centered on the pretrial entrapment hearing and subsequent appeal of the Court's denial of the motion to dismiss on the basis of entrapment. This Court will not second-guess a reasonable decision regarding trial strategy. *People v Putman,* 309 Mich App 240, 248; 870 NW2d 593 (2015). Furthermore, given the overwhelming evidence of Defendant's guilt, Defendant has not shown a reasonable probability that he would have been acquitted had defense counsel performed differently at trial. *Grant, supra* at 486. Therefore, Defendant has not shown that he was denied the effective assistance of counsel, and he cannot meet the "good cause" or "actual prejudice" standards with respect to this issue. MCR 6.508(D)(3).

Defendant next argues that he was denied the effective assistance of counsel because defense counsel failed to investigate or interview any of the prosecutor's witnesses before trial. "'[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Grant, supra* at 485, quoting *Strickland,* 466 US at 690-691. Given the evidence against Defendant, counsel's decision to expend efforts and resources on developing the entrapment defense rather than investigating witnesses in an attempt to challenge Defendant's factual guilt was a

6

Appendix B

## Court of Appeals, State of Michigan

### ORDER

People of MI v Steven Lee Moss

Docket No.    340609

LC No.    2013-244474-FC

Elizabeth L. Gleicher
Presiding Judge

Deborah A. Servitto

Jonathan Tukel
Judges

The Court orders that the motion to waive fees is GRANTED and fees are WAIVED for this appeal only.

The motion to filed an amended application is GRANTED, and the amended application is accepted for filing.

The delayed application for leave to appeal is DENIED because defendant has failed to establish that the trial court erred by denying the motion for relief from judgment.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

MAR 15 2018
Date

Chief Clerk

reasonable one. Furthermore, Defendant has not shown that the testimony of any of the witnesses defense counsel allegedly failed to interview would have benefited him at trial. Therefore, Defendant has not shown that he was prejudiced by defense counsel's performance. *Grant, supra* at 486. Accordingly, Defendant cannot meet the "good cause" or "actual prejudice" standards with respect to this issue. MCR 6.508(D)(3).

Defendant next argues that he was denied his Sixth Amendment right to counsel of his choice. Specifically, Defendant argues that, while he retained attorney David Steingold to represent him with respect to the pretrial and trial proceedings, Mr. Steingold allowed a different attorney, who was not his associate or partner, to question Defendant at the entrapment hearing and to represent Defendant on the second day of his trial. Defendant correctly argues that an element of a criminal defendant's Sixth Amendment right to counsel is "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v Gonzalez-Lopez*, 548 US 140, 144; 126 S Ct 2557; 165 L Ed 2d 409 (2006). Nevertheless, because Defendant does not argue that the Court or any other state actor interfered with his right to counsel of his choice, he has not shown a Sixth Amendment violation. Accordingly, Defendant has not shown that he is entitled to relief with respect to this issue.

Defendant next argues that he was sentenced in violation of *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015) because his minimum sentence range was calculated on the basis of judicially-found facts and his the minimum sentence range would have been lower had judicially-found facts not been considered. Defendant has not met the "good cause" or "actual prejudice" standards with respect to this issue, however, where he has not shown prejudice from the alleged error. This Court first notes that, because Defendant has

7

not specified which offense variables allegedly were scored on the basis of judicially-found facts, he has not met his burden of establishing entitlement to relief from judgment. See *People v Jones*, 201 Mich App 449, 457; 506 NW2d 542 (1993). Furthermore, this Court's review of Defendant's sentence shows that his minimum sentence range would not have changed if the offense variables that appear to this Court to have been scored on the basis of judicially-found facts had not been considered.[2] Therefore, Defendant has not shown that he was prejudiced by the alleged error. *Lockridge, supra* at 394-395. Accordingly, Defendant has not met his burden of demonstrating entitlement to relief from judgment with respect to this issue. MCR 6.508(D)(3).

THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for Relief from Judgment, pursuant to MCR 6.500, *et seq*, is DENIED, pursuant to MCR 6.508(D)(3).

IT IS SO ORDERED.

HON. MARTHA D. ANDERSON
Circuit Court Judge

Dated: 4-21-17

A TRUE COPY
LISA BROWN
Oakland County Clerk - Register of Deeds
By _____
Deputy

PROOF OF SERVICE
The undersigned certifies that the foregoing instrument was served upon all ☒ parties and/or ☒ attorneys of record to the above cause at their respective addresses disclosed on the pleadings on 4-21-17 by:
☒ U.S. Mail ☐ Fax ☐ Hand Delivery
☐ Certified Mail ☐ Registered Mail
_____

---

[2]   Defendant was assessed 100 points for OV 15 on the basis of facts necessarily found by the fact-finder to convict Defendant of possession with intent to deliver 1,000 or more grams of cocaine. In addition, Defendant was assessed five points for OV 2 on the basis of facts necessarily found by the fact-finder to convict Defendant of felony-firearm. Even if the remaining offense variable scores were not considered because they were determined in violation of *Lockridge*, Defendant's total OV score still would have placed him at OV Level VI. MCL 777.62.

8

Appendix C

## FEE AGREEMENT

Steven Lee Moss ("Client") retains Attorney David S. Steingold for legal representation and for the performance of all necessary legal and related services in connection with said representation. Representation is for client's charge of possession with intent to deliver in Oakland County.

The flat rate fee appropriate for said representation is in the amount of $20,000. The fee is due upon Client signing this fee agreement. This fee in non-refundable.

The Client understands that David S. Steingold's representation and Fee in this Agreement does not include any appeal, including but not limited to any interlocutory, or post-trial or post-conviction appeals.

The Client also agrees to pay all costs and fees incurred in handling Client's case. Costs and fees may include, but are not limited to filing fees, deposition expenses, expert witness fees, subpoena fees, transcript fees, and any costs of hiring professional experts, including Investigators. No significant expenses will be incurred without the Client's prior authorization.

It is our intention to vigorously represent the Client consistent with the highest legal and ethical standards, and David S. Steingold will represent the Client's interests to the best of his abilities and experience. The Client agrees to fully cooperate with David S. Steingold in the matter subject to this Agreement, and will inform Mr. Steingold of any changes in circumstances, including change of address.

David S. Steingold cannot guarantee any specific results in your case.

The Law Offices of David S. Steingold, Pllc will keep you informed as to all developments in your case, and will send you copies of all relevant documents and correspondence. If we are not available when you call, we will make every effort to promptly

1

get back to you.  By signing this Agreement, you agree to all of the terms contained herein.  No

alteration of this Agreement may be made other than in writing, signed by both parties.

_____          _____
Signature of Client                                     Signature of Attorney David S. Steingold


DATED: September 4, 2013                       DATED: September 4, 2013


248-812-8500
_____
Client's Contact Telephone Number

2

Appendix D

10/13/2017

# Court Explorer

✎ Register of Actions

← Go Back

**Case Number**
2013-244474-FC

**Entitlement**
PEOPLE vs. MOSS STEVEN LEE

**Judge Name**
MARTHA D. ANDERSON

**Case E-Filed**
NO

**Case Filed**
01/16/2013

**Case Disposed**
11/22/2013

| Date | Code | Desc |
|---|---|---|
| 04/21/2017 | OPN | OPINION FILED & ORD/DENY MTN RELIEF FROM JUDGMENT/POS |
| 04/04/2017 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 04/03/2017 | RES | RESPONSE FILED TO MTN OBTAIN COPY OF FILE |
| 03/29/2017 | DM | DEFENSE MOTION TO OBTAIN A COPY OF TRIAL COUNSEL'S |
| 03/29/2017 | | COMPLETE FILE AND TO COMPEL INTERVIEW OF |
| 03/29/2017 | | TRIAL COUNSEL GRTD |
| 03/29/2017 | ORD | ORDER FILED COUNSEL PRODUCE FILE/APPEAR AT HRG |
| 03/22/2017 | MPR | MOTION PRAECIPE FILED FOR 03292017 JUDGE 04 |

https://courtexplorer.oakgov.com/OaklandCounty/SearchCases/ViewPrintableVersion/?Type=RoA

1/13

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 03/22/2017 | MPR | MOTION PRAECIPE FILED FOR 03292017 JUDGE 04 |
| 03/22/2017 | MTN | MOTION FILED RELIEF FROM JUDGMENT/POS |
| 03/22/2017 | MTN | MOTION FILED OBTAIN COMPLETE FILE/COMPEL INTERVIEW |
| 03/22/2017 | NOH | NOTICE OF HEARING FILED /POS |
| 03/09/2017 | RET | RETURNED FROM COA/CONF FILE/MF |
| 03/09/2017 | LET | LETTER FILED CONF FILE RTND FROM COA |
| 12/30/2015 | RET | RETURNED FROM SUPREME COURT/LW |
| 12/30/2015 | ORD | ORDER FILED SUPREME COURT |
| 06/17/2015 | ORD | ORDER FILED COA |
| 06/15/2015 | ORD | ORDER FILED COA |
| 01/12/2015 | SEN | SENT TO COA/FTP-RESEND/MF |
| 01/09/2015 | SEN | SENT TO COA/FTP/CONF FILES VIA USPS/MF |
| 01/08/2015 | NTC | NOTICE FILED REQ FOR FILE/COA |
| 12/18/2014 | TRN | TRANSCRIPT FILED HRG 11/21/14 |
| 12/11/2014 | TRN | TRANSCRIPT FILED HEARING 11/21/14 |
| 11/21/2014 | OPN | OPINION FILED & ORD/DENY MTN FOR NEW TRIAL |
| 11/21/2014 | H | HEARING HELD 0.50 |
| 11/21/2014 | OTH | COURT TO ISSUE WRITTEN OPINION |
| 11/19/2014 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 11/19/2014 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 11/13/2014 | ANS | ANSWER FILED OPPOSE MTN FOR NEW TRIAL |
| 11/13/2014 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 11/03/2014 | MHC | MOTION FOR HABEAS CORPUS FILED |

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|------|------|------|
| 11/03/2014 | WHC | ORDER WRIT HABEAS CORPUS FILED-WRIT ISSUED |
| 10/28/2014 | NOH | NOTICE OF HEARING FILED |
| 10/28/2014 | MTN | MOTION FILED FOR NEW TRIAL |
| 10/28/2014 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 10/21/2014 | ORD | ORDER FILED FOLLOWING REMAND FROM COA |
| 10/17/2014 | APR | DATE SET FOR GINTHR HRG ON 11212014 08 30 AM Y |
| 10/17/2014 | ORD | ORDER FILED COA |
| 05/22/2014 | ORD | ORDER FILED REMIT PRISONER FUNDS/AMD |
| 05/15/2014 | STP | STIPULATION FILED SUB ATTY FOR DFT |
| 04/29/2014 | AAA | CLAIM OF APPEAL & ORDER APPT ATTY FILED |
| 04/21/2014 | TRN | TRANSCRIPT FILED MTN TO DISMISS 11/01/13 |
| 04/21/2014 | TRN | TRANSCRIPT FILED TRIAL VOL I 11/18/13 |
| 04/21/2014 | TRN | TRANSCRIPT FILED TRIAL VOL II 11/22/13 |
| 04/21/2014 | TRN | TRANSCRIPT FILED SENTENCING 01/06/14 |
| 04/21/2014 | NTC | NOTICE FILED FILING TRN |
| 04/04/2014 | PAY | PAYMNT SERV/ORD PYMNT OF CAA FILED |
| 03/21/2014 | ORD | ORDER FILED GRANT MTN W/DRAW COUNSEL |
| 03/21/2014 | MTN | MOTION FILED W/DRAW ATTY |
| 03/21/2014 | AAA | CLAIM OF APPEAL & ORDER APPT ATTY FILED |
| 03/19/2014 | MTN | MOTION FILED TO WITHDRAW AS COUNSEL |
| 02/11/2014 | CCR | CERTIF CT REPORTER FILED |
| 01/29/2014 | CCR | CERTIF CT REPORTER FILED |
| 01/16/2014 | ORD | ORDER FILED REMIT FUNDS |

10/13/2017

https://courtexplorer.oakgov.com/OaklandCounty/SearchCases/ViewPrintableVersion?Type=RoA

3/13

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 01/16/2014 | AAA | CLAIM OF APPEAL & ORDER APPT ATTY FILED |
| 01/16/2014 | NTA | NOTICE OF TIMELY APPEAL FILED |
| 01/16/2014 | ORD | ORDER FILED REIMBURSE ATTY COSTS |
| 01/06/2014 | S | SENTENCED ON: 01/06/14 |
| 01/06/2014 | | FOUND GUILTY ON: 11/22/13 |
| 01/06/2014 | | DEPARTMENT OF CORRECTIONS |
| 01/06/2014 | CHS | 333.74012A1 CrS-DEL/MANF (NARC) 1000/MORE |
| 01/06/2014 | | SENTENCED - CONVICTED BY COURT G |
| 01/06/2014 | | MIN: 15 YEARS 0 MONTHS 0 DAYS |
| 01/06/2014 | | MAX: 45 YEARS 0 MONTHS 0 DAYS |
| 01/06/2014 | | BEGINNING 01/06/14 |
| 01/06/2014 | | CREDIT FOR 0 MONTHS 0 DAYS |
| 01/06/2014 | CHS | 750.227B-A WEAPONS-FELONY FIREARM |
| 01/06/2014 | | SENTENCED - CONVICTED BY COURT G |
| 01/06/2014 | | MIN: 2 YEARS 0 MONTHS 0 DAYS |
| 01/06/2014 | | MAX: 2 YEARS 0 MONTHS 0 DAYS |
| 01/06/2014 | | BEGINNING 01/06/14 |
| 01/06/2014 | | CREDIT FOR 0 MONTHS 53 DAYS |
| 01/06/2014 | | ATTORNEY FEES |
| 01/06/2014 | VRF | VICTIMS RIGHTS FEE $130 |
| 01/06/2014 | MSC | STATE MINIMUM COSTS OF $136.00 |
| 01/06/2014 | | OTHER: (X) SENTENCE(S) TO BE SERVED CONSECUTIVELY TO: |
| 01/06/2014 | | (X) EACH OTHER, ( ) CASE NUMBERS ( ) PAROLE. |

4/13

10/13/2017

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|------|------|------|
| 01/06/2014 | | COMPLY WITH DNA TESTING. |
| 01/06/2014 | ES | END OF SENTENCE INFORMATION |
| 01/06/2014 | JTS | JUDGMENT OF SENTENCE FILED |
| 01/06/2014 | S | SENTENCE IN FRONT OF ANDERSON |
| 12/30/2013 | MEM | MEMORANDUM FILED SENTENCING/PEOPLES |
| 12/30/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 12/30/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 11/26/2013 | DNA | ORDER FOR DNA FILED |
| 11/25/2013 | STP | STIPULATION FILED FACTS TO CONSIDERIN BENCH TRIAL |
| 11/22/2013 | NJE | NON-JURY TRIAL ENDED 0.25 |
| 11/22/2013 | FDN | FINAL DISPOSITION NON-JURY GAC |
| 11/22/2013 | APR | DATE SET FOR SENTENCE ON 01062014 08 30 AM |
| 11/22/2013 | OTH | PLF PROP QUESTIONS FILED UNDER SEAL/HW |
| 11/22/2013 | OTH | DFT PROP QUESTIONS FILED UNDER SEAL |
| 11/22/2013 | OTH | DVD 8/23/13 FILED UNDER SEAL/HW |
| 11/22/2013 | OTH | DVD 9/11/13 FILED UNDER SEAL/HW |
| 11/22/2013 | MTN | MOTION FILED TO SEAL 9/11/13 UNDER SEAL/HW |
| 11/22/2013 | MTN | MOTION FILED RECONSID 9/11/13 UNDER SEAL/HW |
| 11/22/2013 | ORD | ORDER FILED BOND REVOKED |
| 11/22/2013 | MTN | MOTION FILED PLF EMERGNCY 9/11/13 UNDER SEAL/HW |
| 11/22/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED 9/11/13 UNDER SEAL/HW |
| 11/22/2013 | POR | PROPOSED ORDER FILED 9/11/13 UNDER SEAL/HW |
| 11/22/2013 | MTN | MOTION FILED PLF SEAL RESPNSE 9/12/13 UNDER SEAL/HW |

10/13/2017

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 11/22/2013 | RES | RESPONSE FILED PLF TO MTN RECONSID 9/12/13 UNDER SEAL/HW |
| 11/22/2013 | BRF | BRIEF FILED SUPPT RESPNSE 9/12/13 UNDER SEAL/HW |
| 11/22/2013 | POR | PROPOSED ORDER FILED REIMBURSE 9/12/13 UNDER SEAL/HW |
| 11/22/2013 | OTH | AGENTS NOTES 9/12/13 FILED UNDER SEAL/HW |
| 11/22/2013 | OTH | DVD 9/13/13 FILED UNDER SEAL/HW |
| 11/22/2013 | OTH | DVD 9/17/13 FILED UNDER SEAL/HW |
| 11/18/2013 | NJB | NON-JURY TRIAL BEGUN 0.25 TO RETURN ON 11222013 |
| 11/18/2013 | | AT 8:30 |
| 11/12/2013 | TRN | TRANSCRIPT FILED EVID HRG 09/19/13 |
| 11/12/2013 | TRN | TRANSCRIPT FILED EVID HRG 9/16/13 |
| 11/12/2013 | TRN | TRANSCRIPT FILED EVID HRG 09/17/13 |
| 11/01/2013 | OTH | HEARING HELD |
| 11/01/2013 | DM | DEFENSE MOTION TO DISMISS BASED ON ENTRAPMENT -D- |
| 11/01/2013 | DM | DEFENSE MOTION REINSTATE JURY DEMAND -D- |
| 11/01/2013 | M | MOTION REVOKE BOND -D-; BOND MODIFIED |
| 11/01/2013 | | DEFENDANT TO WEAR TETHER ON HOUSE ARREST |
| 11/01/2013 | OTH | DEFENDANT'S MOTION FOR RECONSIDERATION |
| 11/01/2013 | | TO BE FILED BY 11/08/13 |
| 11/01/2013 | APR | DATE SET FOR TRIAL ON 11182013 01 30 PM |
| 11/01/2013 | ORD | ORDER FILED GRANT IN PART MTN CANCEL BOND/TETHER |
| 10/21/2013 | STP | STIPULATION FILED ADJ ENTRAPMENT HRNG |
| 10/21/2013 | ADJ | ORDER OF ADJOURNMENT FILED ENTRAPMENT HRNG |
| 10/17/2013 | DAU | DEFENDANT/ATTY UNAVAILABLE |

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|------|------|------|
| 10/17/2013 | APC | ADJ-COUNSEL 10182013 TO 11012013 BY ORDER |
| 10/17/2013 | APR | DATE SET FOR HEARING ON 11012013 08 30 AM |
| 10/14/2013 | | **COPY OF ORDER TO SEAL SENT TO SUP CT/SCAO-HW** |
| 10/11/2013 | MTN | MOTION FILED TO SEAL MEM & EXH/UNDER SEAL/HW |
| 10/11/2013 | MEM | MEMORANDUM FILED SUPPT MTN DISQUALIFY JDG/UNDER SEAL/HW |
| 10/11/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 10/10/2013 | ORD | ORDER FILED SEAL DOCUMENTS |
| 10/09/2013 | PAY | PAYMNT SERV/ORD PYMNT OF CAA FILED |
| 10/08/2013 | ORD | ORDER FILED ATTY PAYMNT |
| 10/03/2013 | ORD | ORDER FILED & OPINION DENY MTN TO DISQUALIFY |
| 10/01/2013 | OI | OPINION ISSUED DM DE NOVO REVIEW TO DQ DENIED |
| 10/01/2013 | OI | OPINION ISSUED DM DE NOVO REVIEW DISQUAL CHIEF JUDGE -D- |
| 10/01/2013 | APR | DATE SET FOR HEARING ON 10182013 08 30 AM Y |
| 10/01/2013 | OI | OPINION ISSUED PREVIOUS O/I IS UNDER SEAL |
| 10/01/2013 | PAY | PAYMNT SERV/ORD PYMNT OF CAA FILED |
| 09/24/2013 | ORD | ORDER FILED DENY MTN FOR ASSISTANCE |
| 09/20/2013 | ORD | ORDER FILED DENY DFTS MTN DISQUALIFICATION |
| 09/19/2013 | H | HEARING HELD 0.50 |
| 09/19/2013 | DM | DEFENSE MOTION DISQUALIFY COURT -D- |
| 09/18/2013 | MTN | MOTION FILED RE VIOLATION OF PROTECTIVE ORDER |
| 09/17/2013 | H | HEARING HELD 1.00 CONT 09/19/13 |
| 09/16/2013 | H | HEARING HELD 0.50 ENTRAPMENT |
| 09/16/2013 | OTH | CONTINUE HEARING 09/17/13 |

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|------|------|------|
| 09/12/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 09/11/2013 | STO | STIP/ORD FILED PROTECTIVE |
| 09/10/2013 | ORD | ORDER FILED FOR REIMBURSEMENT OF WITNESS EXPENESES |
| 09/09/2013 | APP | APPEARANCE FILED |
| 09/09/2013 | ORD | ORDER FILED SUB ATTY |
| 09/09/2013 | PTH | PRE-TRIAL HELD |
| 09/06/2013 | DM | DEFENSE MOTION ADJ OF ENTRAPMENT HRG & TRIAL -G- |
| 09/06/2013 | CHA | CHANGE OF ATTORNEY |
| 09/06/2013 | APC | ADJ-COUNSEL 09092013 TO 09162013 BY ORDER |
| 09/06/2013 | APR | DATE SET FOR HEARING ON 09162013 08 30 AM |
| 09/06/2013 | CHA | CHANGE OF ATTORNEY |
| 09/06/2013 | APC | ADJ-COUNSEL 09102013 TO 09172013 BY ORDER |
| 09/06/2013 | APR | DATE SET FOR TRIAL ON 09172013 08 30 AM |
| 09/05/2013 | APR | DATE SET FOR PRETRIAL ON 09062013 08 30 AM Y |
| 08/26/2013 | OTH | DVD OF 8/23/13 IN CAMERA REVIEW FILED UNDER SEAL/HW |
| 08/26/2013 | | **COPY OF PROTECTIVE ORDER SENT TO SCAO/SUP CT/HW |
| 08/23/2013 | OTH | IN CAMERA HEARING HELD |
| 08/23/2013 | OTH | ADJOURN ENTRAPMENT HRG TO 9/9/13 AT 1:30 |
| 08/23/2013 | JIT | JUDGE IN TRIAL |
| 08/23/2013 | APJ | ADJ-JUDGE 08282013 TO 09092013 BY NOTICE |
| 08/23/2013 | APR | DATE SET FOR HEARING ON 09092013 01 30 PM Y |
| 08/13/2013 | STO | STIP/ORD FILED UNDER SEAL |
| 08/12/2013 | GIF | GEN INFO FILED 2ND AMD |

10/13/2017

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 08/08/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 08/06/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 07/16/2013 | ORD | ORDER FILED APPNT INVESTIGATOR |
| 07/10/2013 | DM | DEFENSE MOTION FOR APPOINTMENT OF INVESTIGATOR ON BEHALF OF DEFENDANT GRTD |
| 07/10/2013 | AID | ADJOURN FOR INVESTIGATION/DISCOVERY |
| 07/10/2013 | APC | ADJ-COUNSEL 07112013 TO 08282013 BY NOTICE |
| 07/10/2013 | APR | DATE SET FOR HEARING ON 08282013 02 00 PM Y |
| 07/10/2013 | APR | DATE SET FOR TRIAL ON 09092013 01 30 PM Y |
| 07/02/2013 | MPR | MOTION PRAECIPE FILED FOR 07102013 JUDGE 04 |
| 07/02/2013 | NOH | NOTICE OF HEARING FILED |
| 07/01/2013 | MPR | MOTION PRAECIPE FILED FOR 07102013 JUDGE 04 |
| 06/18/2013 | FMA | ALLOW FILING OF MOTIONS |
| 06/18/2013 | APC | ADJ-COUNSEL 06252013 TO 07112013 BY NOTICE |
| 06/18/2013 | APR | DATE SET FOR HEARING ON 07112013 08 30 AM Y |
| 06/18/2013 | MPR | MOTION PRAECIPE FILED FOR 06262013 JUDGE 04 |
| 06/18/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 06/18/2013 | PRF | PEOPLES RESP FILED TO MTN APPNT INVESTIGATOR |
| 06/17/2013 | NOH | NOTICE OF HEARING FILED |
| 06/13/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 06/13/2013 | NOH | NOTICE OF HEARING FILED |
| 06/13/2013 | REQ | REQUEST FILED FOR DISC/DFT |
| 06/13/2013 | MTN | MOTION FILED APPOINT INVESTIGATOR/DFT |

10/13/2017

https://courtexplorer.oakgov.com/OaklandCounty/SearchCases/ViewPrintableVersion?Type=RoA

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 06/10/2013 | PTH | PRE-TRIAL HELD ENTRAPMENT HEARING WILL OCCUR ON TRIAL |
| 06/10/2013 | | DATE OF 06252013 |
| 06/10/2013 | SE | SCHEDULING ERROR SET FOR HEARING |
| 06/10/2013 | APJ | ADJ JUDGE 06252013 BY NOTICE |
| 06/10/2013 | APR | DATE SET FOR HEARING ON 06252013 08 30 AM |
| 06/10/2013 | APP | APPEARANCE FILED |
| 06/10/2013 | REQ | REQUEST FILED FOR DISCOVERY/DFT |
| 06/07/2013 | APR | DATE SET FOR PRETRIAL ON 06102013 08 30 AM Y |
| 06/07/2013 | MTN | MOTION FILED TO ADJOURN ENTRAPMENT HEARING |
| 06/04/2013 | CAA | ORDER COURT APPOINTED ATTORNEY FILED SUB ATTY |
| 05/28/2013 | PTH | PRE-TRIAL HELD |
| 05/28/2013 | DM | DEFENSE MOTION (ORAL) TO WITHDRAW GRTD |
| 05/28/2013 | APR | DATE SET FOR TRIAL ON 06252013 08 30 AM |
| 05/22/2013 | CAA | ORDER COURT APPOINTED ATTORNEY FILED SUB ATTY |
| 05/20/2013 | OTH | ENTRAPMENT HEARING NOT HELD |
| 05/20/2013 | DM | DEFENSE MOTION ADJ HEARING FOR DEF TO RETAIN NEW |
| 05/20/2013 | | COUNSEL; COURT APPTS ATTY IN THE INTERIM |
| 05/20/2013 | APR | DATE SET FOR PRETRIAL ON 05282013 08 30 AM |
| 05/20/2013 | APR | DATE SET FOR HEARING ON 06132013 08 30 AM |
| 05/20/2013 | OTH | NEW ENTRAPMENT HEARING DATE 06/13/13; |
| 05/20/2013 | | THIS IS NO LONGER THE TRIAL DATE |
| 05/09/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 05/01/2013 | AID | ADJOURN FOR INVESTIGATION/DISCOVERY |

| Date | Code | Desc |
|---|---|---|
| 05/01/2013 | APC | ADJ-COUNSEL 05012013 TO 05202013 BY ORDER |
| 05/01/2013 | APR | DATE SET FOR HEARING ON 05202013 01 30 PM |
| 05/01/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 04/10/2013 | OTH | SET FOR ENTRAPMENT HEARING |
| 04/10/2013 | APR | DATE SET FOR HEARING ON 05012013 01 30 PM Y |
| 04/03/2013 | M | MOTION TO ADJ TRIAL GRTD |
| 04/03/2013 | AID | ADJOURN FOR INVESTIGATION/DISCOVERY |
| 04/03/2013 | APC | ADJ-COUNSEL 04292013 TO 06132013 BY ORDER |
| 04/03/2013 | APR | DATE SET FOR TRIAL ON 06132013 08 30 AM |
| 04/02/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 04/01/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 03/29/2013 | MPR | MOTION PRAECIPE FILED FOR 04102013 JUDGE 04 |
| 03/29/2013 | BRF | BRIEF FILED SUPPT RES TO MTN TO CONDUCT HRG |
| 03/29/2013 | PRF | PEOPLES RESP FILED TO MTN TO CONDUCT ENTRAPMENT HRG |
| 03/28/2013 | GIF | GEN INFO FILED 1ST AMD |
| 03/28/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 03/28/2013 | MTN | MOTION FILED ADJ TRIAL |
| 03/26/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 03/19/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 03/18/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 03/18/2013 | POS | AFFIDAVIT/PROOF OF SERVICE FILED |
| 03/14/2013 | OTH | DEMAND FOR DISCOVERY/PEOPLE FILED |
| 03/13/2013 | BRF | BRIEF FILED SUPPT MTN |

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 03/13/2013 | MTN | MOTION FILED CONDUCT ENTRAPMENT HRG |
| 02/26/2013 | ORD | ORDER FILED PRETRIAL |
| 02/25/2013 | PTH | PRE-TRIAL HELD |
| 02/25/2013 | APR | DATE SET FOR EVIDNT HRG ON 04102013 01 30 PM |
| 02/25/2013 | APR | DATE SET FOR TRIAL ON 04292013 01 30 PM |
| 01/30/2013 | DCR | DISTRICT COURT RETURN FILED |
| 01/30/2013 | SBF | SURETY BOND FILED YOU WALK BAIL BOND |
| 01/16/2013 | GIF | GEN INFO FILED |
| 01/28/2013 | ARR | ARRAIGNMENT IN COURT |
| 01/28/2013 | APR | DATE SET FOR PRETRIAL ON 02252013 08 30 AM |
| 01/17/2013 | N | NTC CT ADMN FILED |
| 01/16/2013 | N | NOTICE FROM COURT ADMINISTRATOR FILED |
| 01/16/2013 | A | PROSECUTORS ORDER 12-98240 |
| 01/16/2013 | | ARRESTING AGENCY: OAKLAND COUNTY SHERIFFS DEPT. |
| 01/16/2013 | | 48 DISTRICT COURT 12-005424 |
| 01/16/2013 | CTN | CENTRAL TRACT 63-12-098240-01 |
| 01/16/2013 | SID | STATE ID NOT AVAILABLE |
| 01/16/2013 | DOF | DATE OF OFFENSE 11/09/12 |
| 01/16/2013 | CCA | ARRAIGNMENT - MON, 01282013 AT 0830AM |
| 01/16/2013 | DCX | EXAM FOR 01/16/13 WAIVED |
| 01/16/2013 | DOB | BIRTH YEAR - 70 |
| 01/16/2013 | CHG | 333.74012A1 C/S-DEL/MANF (NARC) 1000/MORE BOUND OVER AS CHARGED |

10/13/2017

Court Explorer | Oakland County, Michigan

| Date | Code | Desc |
|---|---|---|
| 01/16/2013 | CHG | 750.227B-A WEAPONS-FELONY FIREARM |
| 01/16/2013 | | BOUND OVER AS CHARGED |
| 01/16/2013 | COB | CONDITIONS ON BOND |
| 01/16/2013 | BON | BOND POSTED BY: YOU WALK BAIL BONDS |
| 01/16/2013 | | ADDRESS: 1442 BRUSH STREET |
| 01/16/2013 | | DETROIT MI 48226 |
| 01/16/2013 | | TYPE: CASH/SURETY |
| 01/16/2013 | | AMOUNT: $350,000 |
| 01/16/2013 | APR | DATE SET FOR ARRAIGNMEN ON 01282013 08 30 AM Y |

https://courtexplorer.oakgov.com/OaklandCounty/Search/Cases/ViewPrintableVersion?Type=RoA

© 2017 Oakland County